IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AGRI-SALES, INC.,                )
                                 )
                    Plaintiff,   )
                                 )
          v.                     )     No.  05 C 372
                                 )
UNITED POTATO CO., INC.,         )
et al.,                          )
                    Defendants.  )

MEMORANDUM OPINION AND ORDER

Agri-Sales, Inc. ("Agri-Sales") has filed a nine-count Amended Complaint against United Potato Co., Inc. ("United Potato") and Allen and Nancy Zelken (respectively "Allen" and "Nancy" and collectively "Zelkens"), seeking (1) enforcement of Agri-Sales' rights under the Perishable Agricultural Commodities Act ("PACA," 7 U.S.C. §499a to 499t) and (2) relief on theories of breach of contract, breach of fiduciary duty, fraudulent transfer, conversion and unlawful retention of PACA trust assets.[1] After engaging in discovery, United Potato and Zelkens filed what they labeled as a motion for summary judgment under Fed. R. Civ. P. ("Rule") 56, asserting alternatively (1) that Agri-Sales had waived its right to trust protection under PACA or (2) that Agri-Sales' PACA trust protection should be limited to exclude certain transactions in which Agri-Sales had engaged in

---

[1] All further references to PACA's provisions will simply take the form "Section --," omitting the prefatory "7 U.S.C." All references to the PACA regulations in 7 C.F.R. will take the form "Reg. § --," omitting the prefatory "7 C.F.R."

self-dealing.  Agri-Sales has countered with its own Rule-56-labeled cross-motion, arguing that it was entitled to summary judgment on all nine counts that it had brought against United Potato and Zelkins.

Despite the stated breadth of those cross-motions, during a May 17, 2006 status hearing the parties conceded that the only issue that was ripe for decision (and on which they had met head on in their briefing) was whether Agri-Sales had preserved its right as a PACA trust beneficiary.  That confirmed what this Court had already gleaned from the parties' submissions:  that the motions really did not fit under the Rule 56 rubric, but were instead properly viewed as Rule 16 issue-narrowing motions--motions that should be entertained because they would assist in shaping the future course of the litigation.[2]

For the reasons stated in this memorandum opinion and order, this Court finds that Agri-Sales has preserved its status as a PACA trust beneficiary and accordingly grants Agri-Sales' Rule 16 motion on that issue.  United Potato's cross-motion is of course denied.

## Standard of Review

Resolution of issues as a matter of law under Rule 16 is

---

[2] Because United Potato and Zelkens had brought their Rule 16 motion together, for ease and convenience this opinion will treat United Potato and Zelkens as one in addressing that motion, referring to them simply as "United Potato."

directly analogous to a Rule 56(d) proceeding in the summary judgment area--but only as to those issues, not as to the entire case (see 6A Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d §1529, at 299-301 (2d ed. 1990)). So this Court will apply the familiar Rule 56 principles to frame the legal analysis.

Those principles impose on the movant the burden of establishing a lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate an issue of triable fact" (id.). Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Where as here cross-motions for summary judgment are involved, those principles require the adoption of a Janus-like perspective: As to each motion, the nonmovant's version of any disputed and evidence-

supported facts is credited.[3]

### Background[4]

Agri-Sales is an Illinois corporation that sells onions and potatoes (A. St. ¶¶3, 4; H. Dep. 9). United Potato, also an Illinois corporation, purchased onions from Agri-Sales in a series of transactions from 2002 through 2004 (A. St. ¶6; H. Dep. 20-22; H. Dep. Ex. D-5). Allen is President of United Potato, and Nancy is his wife (A. St. ¶8; U. St. ¶3).

United Potato operated its business out of a storefront at 183 South Water Market Street, Chicago ("183 South Water")(A. St. ¶13). In June 2003 Allen was notified that the 183 South Water property was being purchased and that United Potato would be forced to vacate the premises in December 2003 (id. ¶14). At that time United Potato was experiencing significant financial

---

[3] This District Court's LR 56.1 implements Rule 56 by requiring parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. Although that LR does not by its terms apply to Rule 16 motions, the parties' presentations were (as already stated) made in Rule 56 terms, so both parties have complied with the LR's directive. Each side's LR 56.1 statement is cited here as "St. ¶--," and United Potato's response to Agri-Sales' LR 56.1 statement is cited as "U. R. St. ¶--." Finally, United Potato's memorandum in support of its motion is cited as "U. Mem."

[4] Both sides have submitted as evidence the deposition of Agri-Sales' President and sole shareholder Michael Hughes ("Hughes")(A. St. ¶5), although the two submissions appear to have different pagination. Citations to that deposition ("H. Dep.") will employ the page numbers in the copy submitted by Agri-Sales. Citations to Allen's deposition will take the form "Z. Dep."

4

difficulties (id. ¶15).

Between June and December 2003 Hughes and Allen had several conversations about how to keep United Potato running (A. St. ¶19). One option that the two discussed was for United Potato to purchase or rent a new warehouse from which it could continue to operate. But that option, the two quickly realized, was not financially feasible for United Potato (id. ¶20).

Another option that Hughes and Allen considered was to have Allen work for Agri-Sales (A. St. ¶21). At Allen's request Hughes provided him with a one-page skeletal outline summary (the "Outline," H. Dep. Ex. D-2) of how Agri-Sales would calculate his compensation if he were to become an Agri-Sales employee (A. St. ¶22; U. R. St. ¶22; H. Dep. 111-12, 203; Z. Dep. 92-93). One of the Outline provisions would have required Allen to take out life insurance on the debt that United Potato owed Agri-Sales (H. Dep. Ex. D-2).

No further correspondence was exchanged between Hughes and Allen on the matter of the latter's possible employment with Agri-Sales, and the parties dispute the effect that the Outline had on their business relationship. Allen says that after Hughes issued the Outline, and consistently with its terms, he became an employee of Agri-Sales while also remaining the President and sole employee of United Potato (Z. Dep. 29). For his part, Hughes testified that at the time he created the Outline he

believed that having Allen work for Agri-Sales would not help United Potato pay down its debt, as a result of which he did not pursue the matter further (H. Dep. 81, 112). Instead Hughes judged it best simply to have United Potato operate out of Agri-Sales' office in Waukegan: In that way, Hughes believed that United Potato could eliminate its overhead and therefore pay off its creditors (particularly Agri-Sales) more quickly (A. St. ¶31; U. Resp. St. ¶¶31, 34). Allen agreed to that move, and on or about January 15, 2004 United Potato relocated to Agri-Sales' offices (H. Dep. 27).[5]

At that time United Potato owed Agri-Sales between $150,000 and $200,000 (A. St. ¶57; U. St. ¶24). Because Allen was United Potato's lone employee and given his age, Hughes was concerned about how United Potato's debt to Agri-Sales would be paid off if Allen were to become ill or pass away (A. St. ¶65).[6] So at about the same time that United Potato moved into Agri-Sales' office, the parties again discussed the possibility of taking out life insurance on Allen with Agri-Sales as the beneficiary (id. ¶66;

---

[5] Because all further events relevant to this action occurred later in 2004, no year references will be made to such events.

[6] That concern was not entirely unfounded. Allen was hospitalized on two separate occasions in 2004. During those periods Hughes stepped in and made between 30 and 100 sales for United Potato (A. St. ¶¶95, 96, 98). United Potato contests those sales as "self-dealing," although that contention is not the subject of the Rule 16 cross-motions.

6

H. Dep. Ex. D-4). Allen began the process of acquiring a 10-year term life insurance policy around February, and in August or September the policy was actually issued (H. Dep. 138). Agri-Sales paid the first premium for that term insurance (A. St. ¶68).

Meanwhile United Potato continued unsuccessfully to try to pay down its debt and to pay its invoices on time. But Hughes was not satisfied. In August Hughes decided to change the terms of his arrangement with Allen and United Potato in an effort to improve on United Potato's payment history: Agri-Sales began to bill certain United Potato customers (anyone who bought a third of a truckload or more of onions) directly and to apply the proceeds from those sales to cover United Potato's invoices (H. Dep. 122). Soon after that Agri-Sales also began, as to any sales on which Agri-Sales billed a customer directly, to apply United Potato's commission to its unpaid balance, instead of issuing it a commission check (id. 133-34).

That did little to ameliorate United Potato's debt, and about December 1 Hughes told Allen that he expected United Potato to pay $100,000 toward its debt by the end of the year. Hughes referred to that as his "New Year's Resolution" (H. Dep. 194). But United Potato could not afford to pay on Hughes' Resolution, and in that same month United Potato ceased its operations and vacated Agri-Sales' office (A. St. ¶91). It is undisputed that a

7

principal balance of $193,349.55 remains unpaid for 86 purchases that United Potato made between January 30 and December 7 (A. St. ¶92).

PACA Trust Entitlement

PACA was enacted in 1930 to promote fair trading practices in the "perishable agricultural commodities" ("produce")[7] industry and to protect small farmers against financially irresponsible or unscrupulous produce purchasers (Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 199 (3d Cir. 1998)). To that end, and among other requirements,[8] PACA mandates that a licensed "commission merchant, dealer or broker"[9] hold any purchased produce, products derived from that produce and any proceeds from the sale of that produce in trust for the benefit

---

[7] Section 499a(b)(4) defines "perishable agricultural commodity" in these terms:

> (A) Means any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character; and
>
> (B) Includes cherries in brine as defined by the Secretary in accordance with trade usage.

It is undisputed that the onions Agri-Sales sold to United Potato fit that definition.

[8] For example, PACA also bars a variety of unfair trade practices by buyers, including a buyer's failure to "make full payment promptly" (Section 499b(4)), and provides for the payment of damages when violations of PACA occur (Section 499e(a)).

[9] At all times relevant to this action United Potato was a licensed "commission dealer, merchant or broker" (A. St. ¶7).

8

of all unpaid "suppliers or sellers...or agents" who have met the applicable statutory requirements (Section 499e(c)(2); see also Reg. §46.46(b)). PACA creates a level of superpriority under which a seller's interest in the PACA trust takes precedence over the interests of all other creditors, including secured creditors (Greg Orchards & Produce, Inc. v. Roncone, 180 F.3d 888, 891 (7th Cir. 1999)).[10]

In light of that special level of trust protection, PACA establishes strict eligibility requirements. First, a seller must comply with the notice requirements set out in Sections 499e(c)(3) and (4) and Reg. §46.46(f)(Greg Orchards, 180 F.3d at 890-91). Second, a supplier must be selling produce on a cash or short-term credit basis (id. at 891). As Congress explained in H.R. Rep. No. 543, 98th Cong., 2d Sess. 7, reprinted in 1984 U.S.C.C.A.N. 410:

> However, the Committee does not intend the trust to apply to any credit transaction that extends beyond a reasonable period. Under the bill the Secretary is required to establish, through rulemaking, the time by which, the parties to a transaction must agree payment on a transaction must be made, to qualify it for coverage under the trust. An agreement for payment after such time will not be eligible to receive the benefits of the trust.

---

[10] PACA trust rights may be enforced either through a reparation order issued by the Secretary of Agriculture followed by judicial enforcement (Section 499f and g) or via a court action for breach of fiduciary duty (Section 499e(c)(5)). That latter remedy permits recovery against both the corporation and its controlling officers (Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc., 307 F.3d 666, 669 (7th Cir. 2002)).

9

And Reg. §46.46(e)(2) sets out that time limit:

> The maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities as defined in §46.2(dd) and paragraph (a)(1) of this section.

United Potato does not contest Agri-Sales' compliance with PACA's notice requirement, arguing instead that because Agri-Sales and United Potato entered into a post-default agreement that extended United Potato's time for payment beyond 30 days, Agri-Sales has waived (or, more accurately, forfeited) its PACA trust rights. United Potato contends alternatively that the parties had (1) a written agreement or (2) an oral agreement or (3) a course of dealing that allowed for such delayed payment (U. Mem. 2).

Although United Potato gives those three alternatives equal treatment in its briefs, not all agreements are created equal under PACA. On that score Patterson, 307 F.3d at 669 (citations omitted), our Circuit's seminal case relied on heavily by United Potato (Mem. 5, 7, 8-10) as well as by Agri-Sales, explicitly states such inequality:

> If a produce supplier enters a written post-default agreement with a dealer that extends the dealer's time for payment beyond 30 days, the supplier becomes ineligible to assert its trust rights. On the other hand, an oral agreement for an extension or a course of dealing allowing more than 30 days for payment will not abrogate a PACA trust.

In an effort to escape the impact of that "On the other

10

hand..." statement, United Potato tries to invoke <u>Am. Banana Co. v. Republic Nat'l Bank of N.Y.</u>, 362 F.3d 33 (2d Cir. 2004) to support its claim that Agri-Sales lost its status as a PACA trust beneficiary by entering into an oral agreement permitting payment beyond 30 days. But <u>Am. Banana</u> is not the law in our Circuit, and this opinion digresses briefly to make that clear.

In that regard United Potato tries to wriggle out of the flat-out <u>Patterson</u> ruling by citing to an <u>Am. Banana</u> footnote that it claims reconciled <u>Am. Banana</u> and <u>Patterson</u> (U. Mem. 11-12). But that footnote merely calls into question one basis for the <u>Patterson</u> ruling--it does nothing to harmonize the two cases.

As <u>Am. Banana</u>, 362 F.3d at 46 n.6 would have it, <u>Patterson</u> was wrong to rely on <u>Idahoan Fresh</u> to support its ruling that "oral agreements for an extension...allowing more than 30 days for payment will not abrogate a PACA trust." <u>Am. Banana</u> says that to the contrary <u>Idahoan Fresh</u> did not specifically deal with the effect of an oral extension in excess of 30 days, but found only that oral extensions of 15 and 20 days did not abrogate a seller's entitlement to a PACA trust.

Those differing views cannot blur the fact that this Court is bound by the Seventh Circuit's clear teaching, not by some other court's opinion of that teaching. Moreover, <u>Patterson</u> also cited as support for its holding <u>Hull Co. v. Hauser's Foods, Inc.</u>, 924 F.2d 777, 781-82 (8th Cir. 1991), a case that said it

was then addressing an issue of first impression in the Courts of Appeals and that expressly held that "oral agreements have no effect on produce sellers' trust protection." That holding (which Idahoan Fresh, 157 F.3d at 205 notably also cites as support for its own ruling) obviously provides direct--and ample--support for Patterson.

To return to the caselaw that binds this Court, then, even if the parties might be viewed as having entered into an oral agreement or as establishing an unwritten course of dealing that permitted United Potato to pay beyond 30 days, Agri-Sales is still entitled to assert its PACA trust rights. As to the course-of-dealing issue, see also In re Lombardo Fruit & Produce Co., 12 F.3d 806, 810-11 (8th Cir. 1993).

That leaves open only United Potato's contention that Agri-Sales lost its status as a PACA trust beneficiary when it entered into a claimed written agreement for a payment extension. To abrogate PACA trust protection, a written agreement need not be formally executed, but it must "satisf[y] the generally applicable Statute of Frauds" (Patterson, 307 F.3d at 671).

United Potato grounds its claim of written waiver on the Outline and on the insurance policy on Allen's life. But neither document comes even close to resembling a repayment plan.[11]

---

[11] As stated earlier, Rule 16 principles call for crediting, on Agri-Sales' motion, Allen's version of a claimed employment relationship with Agri-Sales. But even if the

12

On that score United Potato never spells out just how the Outline and life insurance policy can have established an agreement on a more-than-30-day payment extension, nor is any such agreement evident on the face of either document. Unlike the post-default installment plans at issue in <u>Patterson</u> and <u>Greg Orchards</u>, the documents here provide no timetable for repayment of United Potato's debt, nor does either document even state the amount of that debt. At most the two documents reflect (1) an agreement to take out life insurance on Allen for whatever balance United Potato might owe to Agri-Sales at the time of his death and (2) that the insurance policy--providing term insurance for which Agri-Sales was never guaranteed any payout--would serve as collateral security for that debt.

Moreover, as to the insurance policy, it clearly does not satisfy the writing requirement of the "generally applicable Statute of Frauds" (<u>Patterson</u>, 307 F.3d at 671). In an effort to fill that gap, United Potato points to asserted admissions made by Hughes during his deposition. In that respect, only a "clear, unequivocal" admission in the course of "deliberate testimony" can constitute a judicial admission that will take a contract out of the Statute of Frauds (<u>Derby Meadows Util. Co. v. Inter-Cont'l</u>

---

unsigned Outline were somehow to be viewed as a writing within the purview of the Statute of Frauds, it does not at all impact the status of United Potato's corporate debt, which is the subject of Agri-Sales' PACA claim.

13

Real Estate, 202 Ill.App.3d 345, 354-55, 559 N.E.2d 986, 991 (1st Dist. 1990); 4 Caroline Brown, Corbin on Contracts §14.2 (rev. ed. 1997).

But although Hughes admits that the parties agreed on taking out a life insurance policy,[12] he never says, as United Potato would have it, that they did so to replace United Potato's pre-existing obligation to pay down its balance. Instead he simply states that the policy was to protect Agri-Sales in case something were to happen to Allen (H. Dep. 112)--something that United Potato concedes in its statement of facts, although it inconsistently argues otherwise in its memorandum (contrast U. St. ¶79 and U. R. Stat. ¶¶65, 69 with U. Mem. 14). That is not enough to qualify as the necessary "unequivocal" judicial admission.

## Conclusion

In short, United Potato's waiver argument has come completely undone, and its Rule 16 motion is denied. Because the same evidence that leads to that conclusion also confirms that Agri-Sales has preserved its rights as a PACA trust beneficiary, its Rule 16 cross-motion seeking a declaration to that effect is granted. This action is set for a status hearing at 9 a.m.

---

[12] Hughes also confirms that Agri-Sales made the first premium payment on that policy, although a copy of the check stub from that payment was not included in either parties' submissions.

14

July 10, 2006 to discuss the future course of this litigation.

                                /s/ Milton I. Shadur
                                _____
                                Milton I. Shadur
                                Senior United States District Judge

Date:  July 5, 2006